In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1919

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ERIC R. MEYER,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 96 CR 10--John C. Shabaz, Chief Judge.

ARGUED NOVEMBER 12, 1999--DECIDED DECEMBER 4, 2000


  Before FLAUM, Chief Judge, and RIPPLE and
ROVNER, Circuit Judges.

  ROVNER, Circuit Judge.  Two years ago,
this court reversed Eric Meyer's
conviction for conspiracy to distribute a
controlled substance and granted him a
new trial based on an instructional
error. United States v. Meyer, 157 F.3d
1067 (7th Cir. 1998), cert. denied, 526
U.S. 1070, 119 S. Ct. 1465 (1999). A
second jury convicted him again on the
conspiracy charge. In this appeal, Meyer
argues that his trial counsel was
ineffective for failing to ask for a
mistrial, or in the alternative, a
cautionary instruction, after a witness
alluded to "murder cases," that the
evidence was insufficient to support the
district court's sentencing determination
that he committed a murder in the course
of the drug conspiracy, and that the
court violated his due process rights
when it cross-referenced the murder
guideline. We affirm.

I.

  We assume familiarity with our opinion
in the previous appeal and confine our
discussion of the facts to those most
pertinent to the issues Meyer has raised.
From 1991 until 1995, Meyer participated
in a narcotics distribution conspiracy
whose members included his co-defendant,

Gordon Hoff, Sr. ("Hoff") and Hoff's son, Gordon Hoff, Jr., known to his associates as "Rock." At the outset of the conspiracy, Hoff supplied both Rock and Meyer with cocaine (and marijuana) for resale to others. Rock developed his own sources of cocaine, however, and at times was able to buy it at prices lower than his father offered him. Indeed, on occasion Rock supplied Hoff with cocaine rather than the other way around. Eventually, in or around August of 1993, Hoff ceded Meyer as a customer to Rock in exchange for a Harley-Davidson motorcycle that Rock had taken from a friend in an insurance scam. Thereafter, Meyer obtained his narcotics on an almost daily basis from Rock (often on credit). On occasion, he lent a hand when Rock, Hoff, or one of their associates needed assistance with transporting cocaine, collecting drug debts, and like tasks.

Dennis Fenner, Hoff's source for marijuana, was one of several people who were murdered in the course of the conspiracy. In the immediate wake of his indictment late in 1995, Hoff, who was cooperating with the authorities in exchange for immunity, said that he suspected Rock of the murder. But investigators later concluded that Meyer had killed Fenner, at Hoff's behest.

At a pre-trial evidentiary hearing in 1996, Rock indicated that in 1994, Hoff (who had recently had a search warrant executed on his property) wanted Fenner killed for fear that he might expose Hoff and his co-conspirators to the police. Rock testified that Hoff arranged a meeting with Fenner at Rock's farm near Osseo, Wisconsin in the middle of one night in late April 1994, and Hoff asked Rock to drive Meyer to that meeting. Rock did so, and he noticed that Meyer had a nine-millimeter Smith & Wesson handgun with him that had once belonged to Rock. Rock and Meyer arrived at the farm first. After giving Meyer a brief tour of an abandoned house on the property, the two men returned outdoors. Rock walked around to the back of the house to relieve himself. While he was so engaged, Rock heard an automobile come up the drive toward the house; he then heard two car doors slam shut, and a moment later he heard several gunshots. When he walked out from behind the house, Rock saw Fenner's body on the ground. Meyer was

standing approximately five feet away with a gun in his hand and Hoff, who was standing next to Meyer, was congratulating Meyer, saying that "it had to be done." R. 116 at 42. Rock testified that he helped the other two men burn Fenner's body over a period of six hours and dispose of some of the ashes in a creek. The three of them then left together in Rock's 1976 Chevrolet Blazer. Hoff later killed Fenner's dog in order to avert suspicion that Fenner had been the victim of foul play. R. 116 at 45, R. 195 at 39.

At Meyer's first sentencing hearing in December 1996, Rock again testified on the subject of Fenner's murder. At that time he added that Hoff had given Meyer a motorcycle because Meyer had killed Fenner. R. 195 at 38, 42.

Rock was by no means a witness of unimpeachable virtue. Aside from having helped Hoff and Meyer (at the least) to dispose of Fenner's body, Rock admitted that he had killed another individual, Kirk Larson, and that he was serving a twenty-year prison term for that murder. R. 195 at 65./1 Rock told the authorities that he killed Larson because Larson had an affair with Carole Tenney. R. 116 at 52-53. (At the time of the Larson murder Tenney was Rock's girlfriend; by the time that the pre-trial evidentiary hearing took place, she was Rock's wife.) Rock acknowledged, however, that his father claimed Rock had killed Larson because he was concerned that Larson might expose his drug-dealing (R. 116 at 51; id. at 71); and Rock agreed that he would have received a more severe sentence for the murder if his father's version were accurate (R. 116 at 53). Tenney, in fact, denied having had an affair with Larson. R. 116 at 93. Rock also acknowledged that his father had turned him in for murder and drug-dealing, and that he did not begin to cooperate with the authorities until Hoff and Meyer had already implicated him in the drug conspiracy. R. 315 at 70-71. Moreover, after Rock pleaded guilty to the federal conspiracy charge, he received a sentence of only ten years, as compared to the life terms that Hoff and Meyer eventually received. Rock also admitted that he owned and had "paged through" books that described how to kill someone silently, how to dispose of

bodies, and how to be a hit man. R. 315 at 77. He admitted that he did not like Fenner. "He was a prick," Rock testified. R. 195 at 66. He admitted as well that he owned a nine-millimeter handgun and that he had threatened to kill another individual with that gun at the Osseo farm, where of course Fenner was slain. R. 195 at 67-68. Indeed, Rock admitted that after he killed Kirk Larson, he killed Larson's dog--just as Hoff, according to Rock, had killed Fenner's dog after Meyer killed Fenner. R. 195 at 66. Two prisoners who testified on Meyer's behalf at his first sentencing hearing reported that Rock had claimed responsibility for multiple murders (although not specifically Fenner's). R. 195 at 228-29, 240, 242-43. Judge Crabb described Rock as "a seriously disturbed, violent young man[.]" R. 198 at 187.  For his part, Rock's father (Hoff) testified that Rock's account of the Fenner killing was a "total lie". R. 198 at 25.

  Carole Tenney Hoff ("Tenney") also testified at the August 1996 evidentiary hearing, and again at Meyer's first and second sentencing hearings. She was not yet married to Rock in April of 1994, but she was living with him. She recalled hearing Hoff tell his son, several days before Fenner disappeared, that Fenner had been talking to the police and could not be trusted. Tenney also recalled that Hoff and Meyer had visited their home on the night before Fenner's disappearance. Although she was in another room of the house, Tenney said that given the volume with which Hoff and Meyer were speaking, she was able to hear bits and pieces of the conversation that they had with Rock that night: "they were just kind of raving." R. 116 at 88. In particular, she claims to have heard Hoff and Meyer say that "they weren't going to have to worry about [Fenner] anymore, and he wasn't going to be talking to anybody." R. 116 at 88. On the following morning, Tenney awoke to find Rock gone from the house. Later that same morning, as she was driving to a class in Eau Claire, she saw Hoff, Rock, and Meyer together in the Blazer. Either that same day or several days later (Tenney wasn't sure which), she asked Rock whether Meyer had shot Fenner. Rock look surprised and purportedly replied, "I don't know. I don't know what you're talking about." R. 116 at 89.

Tenney's testimony had its vulnerable points as well. First, although Tenney attributed to Hoff and/or Meyer the remark that they wouldn't have to worry about Fenner much longer (R. 116 at 87-88), she admitted on cross-examination that it could have been Rock who made that remark (R. 116 at 99). Second, although Tenney claimed to have seen Hoff, Rock, and Meyer together in Rock's Blazer on the morning of Fenner's disappearance, she placed them on a different highway, seated somewhat differently in the Blazer, than Rock did in his own testimony. Compare R. 116 at 80-81 (Rock), with id. at 102-03, 107-08, and R. 318 at 41-43 (Tenney). Third, Tenney could offer no explanation for having asked Rock whether Meyer had killed Fenner. "I just said it. It was really strange actually. I just said it. . . . I really had no reason to think that Eric would do anything like that. I don't even know where it came from." R. 116 at 108. Indeed, she acknowledged that she had never seen Meyer with a gun, although she had seen Rock with a nine-millimeter handgun. R. 116 at 109. Finally, Tenney admitted that she previously had lied and withheld information from the police in order to protect herself and Rock (R. 116 at 92, 104); she also admitted that she had falsely notarized a quitclaim deed for Hoff in the wake of Fenner's murder so that Hoff could take possession of Fenner's property (R. 116 at 103-04, 105). FBI Agent Charles Southworth would later confirm that Tenney had "lied on a few occasions" (R. 198 at 69) and in several instances had changed her statements to the government after being warned that she could be prosecuted (R. 198 at 68-70).

Chance Gaines was incarcerated at the Dane County Jail along with Meyer while Meyer was awaiting retrial. According to Gaines, Meyer had admitted his involvement in Fenner's murder. The government summoned Gaines to testify at Meyer's second trial as well as the subsequent sentencing hearing.

Gaines' testimony at trial was to be limited to the subject of Meyer's participation in the narcotics conspiracy, and the prosecutor would later represent that Gaines was

instructed not to bring up the subject of Fenner's murder. R. 316 at 124. Gaines nonetheless alluded to "murder cases" on two separate occasions during the trial. On direct examination, the prosecutor asked Gaines whether Meyer had said anything to him "about his goal in this trial as it related to Gordy [Hoff] and Rock." R. 316 at 103. Meyer's attorney objected to the question on relevance grounds, but the court overruled the objection. Gaines answered:

He, he told me that he was going to try to, you know, get the conspiracy charges dropped and the murder cases dropped. That Rock was the one that, you know, did it and he framed both of them.

R. 316 at 103. On cross-examination, Gaines acknowledged that the same attorney who was prosecuting Meyer, Mr. Vaudreuil, had also prosecuted Gaines. R. 316 at 122. However, Gaines denied having known that fact when he first informed his own attorney of what Meyer had told him in jail. Meyer's attorney followed up on that point:

Q. So you didn't tell your lawyer to contract Mr.-- contact Mr. Vaudreuil with that information?

A. I told him he--asked him what I could do with it, yeah. I was turning in some evidence here on a murder case. Yeah, I'd like to get the time reduction out of it. I didn't know that Mr. Vaudreuil was the prosecuting attorney.

R. 316 at 122. Meyer's counsel later attempted to clarify whether Gaines, in his earlier reference to "murder cases," was suggesting that Meyer had claimed that "Rock was getting back at him because he gave information about a murder case[.]" R.316 at 123. Gaines did not understand the question, however, and after an unsuccessful attempt to rephrase it, Judge Shabaz summoned the attorneys to a bench conference. There he warned Meyer's counsel that he was exploring a troublesome subject. R. 316 at 124. Meyer's attorney agreed, but felt he had little choice given that Gaines had already broached the subject of murder. Id. At that point, Judge Shabaz asked Meyer's counsel whether he wanted a special instruction directing the jury to ignore that part of Gaines' testimony. R.

316 at 125. Meyer's attorney declined the offer and let the subject drop. The subject of murder was not mentioned again during the trial.

After Meyer was convicted a second time, Gaines returned to testify at the sentencing hearing on the subject of Fenner's murder. According to Gaines, Meyer said that he, Hoff, and Rock had agreed that they needed to get rid of Fenner because he "knew too much" about a murder in Oklahoma and had already been questioned by the FBI in that regard. R. 318 at 59. As a ruse to lure Fenner out to Rock's Osseo farm, Hoff approached Fenner and told him that Rock had been arrested and that they needed to clean out the safe in Rock's farmhouse before the "feds" got to it. R. 318 at 59. Meanwhile, Meyer and Rock drove to the farm and chose hiding places from which they could shoot Fenner. R. 318 at 60. Meyer told Gaines that he was armed with a nine-millimeter pistol and that when Fenner and Hoff arrived, he took a shot at Fenner. R. 318 at 60-61. Gaines asked Meyer whether he was the one who killed Fenner, and Meyer purportedly replied "[Y]eah, but I just can't tell them that." R. 318 at 61. Meyer added that they did not burn Fenner's body near the farmhouse, as Rock had claimed; instead they had taken the body in the Blazer to a nearby creek, river, or lake and burned it there. R. 318 at 61.

Not surprisingly, Gaines' testimony had its vulnerable points. Gaines acknowledged that his own sentence for fraud was reduced from thirty-three to twenty-three months after he testified on the government's behalf at Meyer's second trial. R. 318 at 57. Another person who had been an inmate at the Dane County Jail, Garland Lightfoot, Jr., testified that Gaines had admitted lying to the government about Meyer's responsibility for the murder. R. 318 at 49-50, 55.

The Fenner murder had a substantial impact on Meyer's sentence. Following Meyer's first conviction, Judge Crabb found that Meyer had murdered Fenner in the course of the narcotics conspiracy. R. 198 at 188. Accordingly, she cross-referenced the murder guideline in establishing Meyer's offense level, which resulted in a mandatory term of life imprisonment. See U.S.S.G. sec.

2D1.1(d)(1). After Meyer was convicted the second time on remand, Judge Shabaz also determined that Meyer was responsible for Fenner's murder. Judge Shabaz's determination rested in part upon Judge Crabb's finding, which he believed to be the law of the case, but additionally and independently on his own review of the pertinent evidence on this subject. R. 303 at 6. This included the testimony that Rock had given at the August 1996 evidentiary hearing (R. 303 at 6, R. 318 at 97-101), as corroborated by "other credible evidence by witnesses who . . . previously testified as to the circumstances of the murder" (R. 303 at 6), and the testimony of Chance Gaines, whom Judge Shabaz specifically found to be credible (R. 303 at 6, R. 318 at 101).

## II.

### A.

Meyer charges his trial counsel with ineffectiveness for neglecting to ask for a mistrial and/or a cautionary instruction to the jury after Gaines made gratuitous reference to the "murder cases." In fact, Meyer argues, his attorney compounded the problem by asking questions about these "murder cases" during cross-examination. As Meyer himself acknowledges, our review of a trial attorney's performance is "highly deferential." Strickland v. Washington, 466 U.S. 668, 689, 104 S. Ct. 2052, 2065 (1984); see also, e.g., Lowery v. Anderson, 225 F.3d 833, 843 (7th Cir. 2000). Our analysis begins with the "strong presumption" that the defendant's attorney rendered adequate representation of his client. Kimmelman v. Morrison, 477 U.S. 365, 381, 106 S. Ct. 2574, 2586 (1986); Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Moreover, as the Supreme Court has emphasized, the range of attorney performance that will satisfy the Sixth Amendment's guarantee of counsel is wide. Kimmelman, 477 U.S. at 381, 106 S. Ct. at 2586; Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. To prevail upon a claim of ineffective assistance, a defendant must show both that his counsel's service did not meet an objective standard of reasonableness and that there is a fair probability that but for his attorney's ineffectiveness, the result of the trial would have been different. Kimmelman, 477 U.S. at 381,

106 S. Ct. at 2586; Strickland, 466 U.S. at 687, 104 S. Ct. at 2064./2

Having reviewed the trial record, we do not believe that the decision not to seek a mistrial or, in the alternative, a cautionary instruction was unreasonable. Gaines' two gratuitous references to a murder case or cases were indeed unfortunate, and we agree that it was possible for the jurors to suspect from Gaines' remarks that Meyer was implicated in a murder. On the other hand, the one and only detail that Gaines offered about the "murder cases" was that Meyer had told him "[t]hat Rock was the one that, you know, did it and he framed both of them." R. 316 at 103. That bit of information pointed the finger at Rock as the murderer, rather than Meyer. And in certain respects, Rock's own testimony gave credence to that notion. The jury was read the testimony that Rock had given at the first trial (he refused to testify at the second trial), and in that testimony Rock admitted that he had pleaded guilty to second degree murder in Wisconsin state court and had been sentenced to a twenty-year prison term. R. 315 at 20. Indeed, Rock admitted that he decided to plead guilty after Hoff and Meyer had made statements incriminating him. R. 315 at 71. Rock's testimony was therefore ameliorative in two respects: it would have helped draw the suspicions raised by Gaines' remarks away from Meyer, and it gave credence to Meyer's contention (as reported by Gaines) that Rock was attempting to "frame" both Hoff and Meyer for having incriminated him. Quite clearly it was the latter theme that Meyer's counsel was attempting to reinforce on cross-examination, when he asked Gaines whether Rock was attempting to get back at Meyer for information he had given on a murder case. R. 316 at 123. Successful or not, we cannot say that his attempt was beyond the range of reasonable tactical decisions once the charge of murder was unexpectedly put in the air. Nor can we fault Meyer's attorney for declining a limiting instruction or for not seeking a mistrial. For the reasons we have discussed, the import of Gaines' remarks was, in the end, ambiguous. A mistrial motion would surely have been denied. And where, as here, a witness has raised an extraneous matter in his testimony, an instruction directing the jury to

disregard the reference always presents the risk that it will unduly highlight the problematic testimony. Under the circumstances presented here, the decision not to ask for such an instruction, and to simply let the matter drop, was a reasonable tactical decision and, as such, did not deprive Meyer of the effective assistance of counsel. See United States v. Myers, 917 F.2d 1008, 1010-11 (7th Cir. 1990).

B.

Judge Shabaz's determination that Meyer killed Fenner is a finding of fact that we review for clear error. We noted earlier that Judge Shabaz treated Judge Crabb's previous, identical finding as the law of the case; but he also made an independent finding, based on the evidence before him (which included the testimony of Gaines, who did not testify before Judge Crabb), that Meyer was responsible for Fenner's murder. Neither party suggests that Judge Shabaz's determination is dependent upon Judge Crabb's; both, in fact, largely ignore the law of the case aspect of his determination. Meyer instead contends that the credibility of the government's witnesses is so impaired that their testimony is unreliable as a matter of law, and therefore insufficient to support Judge Shabaz's finding./3

However undistinguished the government's witnesses were, we do not believe that Judge Shabaz was precluded from relying on them. Rock, Tenney, and Gaines, the three key witnesses, each had motives to lie, and their accounts of the Fenner murder were not wholly consistent in the details. The district judge, as the finder of fact, would have been free not to credit their testimony. But the credibility determinations were his to make, and he chose to believe these witnesses. That the witnesses against Meyer had impure motives, criminal histories, and a record of telling lies is not remarkable. Nothing in the record supports the contention that they were incredible as a matter of law. And although there were some inconsistencies among their accounts of the murder (as to where precisely Fenner's body was disposed of, for example, or what road Rock, Hoff, and Meyer took after the murder), the discrepancies are not so

serious as to render the basic proposition on which they all agreed--that Meyer shot Fenner at the Osseo farm--implausible. See Kidd v. Illinois State Police, 167 F.3d 1084, 1095 (7th Cir. 1999).

C.

Finally, Meyer contends that sentencing him pursuant to the first-degree murder guideline violated his right to due process, given that the jury convicted him solely of conspiring to distribute narcotics. Hoff made this same argument, unsuccessfully, in Meyer I. (Judge Crabb found that he directed Meyer to murder Fenner, and also that he had murdered another individual). See 157 F.3d at 1081-82. We reject Meyer's argument for the same reasons.

III.

For the reasons discussed above, we AFFIRM Meyer's conviction and sentence.

FOOTNOTES

/1 When he testified at Meyer's first sentencing hearing, Rock acknowledged that he had burned Larson's body at his farm on the very spot that Fenner's body was incinerated. R. 195 at 67.

/2 Ineffectiveness claims are normally not well-suited to consideration on direct appeal. E.g., United States v. Neeley, 189 F.3d 670, 683 (7th Cir. 1999), cert. denied, 120 S. Ct. 1245 (2000). In this case, however, the claim rests exclusively on the trial record and Meyer is not represented on appeal by the same person who represented him at trial. See id.

/3 We are not called upon to determine here whether clear and convincing evidence, as opposed to a mere preponderance, was required to support the murder finding. See United States v. Masters, 978 F.2d 281, 286-87 (7th Cir. 1992), cert. denied, 508 U.S. 906, 113 S. Ct. 2333 (1993). Nor are we asked to consider whether the evidence that Meyer killed Fenner might meet the preponderance threshold but not rise to the level of clear and convincing evidence. Meyer contends that the government's witnesses are so unreliable as to fall short of even the lesser benchmark.