In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1030

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEANDER RODGERS,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 97 CR 108--John Daniel Tinder, Judge.

Argued January 12, 2001--Decided April 5, 2001

Before RIPPLE, ROVNER, and EVANS, Circuit Judges.

ROVNER, Circuit Judge.  A jury convicted Leander
Rodgers of conspiring to possess cocaine and
cocaine base with the intent to distribute these
narcotics, in violation of 21 U.S.C. sec.sec.
841(a)(1) and 846. At sentencing, Judge Tinder
found by a preponderance of the evidence that
Rodgers was responsible for the distribution of
250 grams of crack cocaine and 349 grams of
powder cocaine. The quantity of crack cocaine
that the judge attributed to Rodgers had the
effect of triggering a mandatory minimum prison
term of ten years. See 21 U.S.C. sec. 841(b)(1)
(A)(iii). Based on the Supreme Court's recent
opinion in Apprendi v. New Jersey, 530 U.S. 466,
120 S. Ct. 2348 (2000), Rodgers maintains that
the drug quantity, because it had the effect of
imposing a floor on the length of time he would
spend in prison, constituted an element of his
offense that the government was required to
prove, and the jury was required to find, beyond
a reasonable doubt. He secondarily contends that
the district judge erred in holding him to
account for 250 grams of cocaine base, because
that finding was based on uncorroborated and (in
his view) unreliable testimony.

I.

  Along with his two cousins, Dexter and
Demetrius Erby, as well as a number of other

individuals, Rodgers participated in a drug trafficking operation that imported powder and crack cocaine to the Muncie, Indiana area from New York State. At first, individual co-conspirators would either drive or fly to New York in order to obtain the cocaine from Dexter Erby; on other occasions, the cocaine was sent to Indiana via Federal Express. Later, after Rodgers had begun to work for Federal Express in Muncie and one of the co-conspirators had been stopped while carrying $9,000 in drug purchase money, the conspiracy began to use Western Union as the primary means of transmitting money to New York and Federal Express as the principal means of shipping the cocaine to Indiana. Typically, the shipper of cocaine (Dexter Erby, who used a series of fictitious names) would execute a release on the Federal Express air bill form so that the package could simply be left at the receiving address without any person being there to sign for it. Often, the package was directed to a vacant residence where the Muncie-based members of the conspiracy could pick it up. By virtue of his position, Rodgers was able to provide his fellow conspirators with information as to how Federal Express handled packages and to track shipments (on one occasion, he was able to determine that a delayed package had been intercepted by a Muncie police officer). He also provided the addresses of some vacant houses for use as delivery locations. On several occasions, cocaine was shipped to Rodgers' home; on two other occasions, Rodgers delivered cocaine for Demetrius Erby. He also picked up a delivered package himself on one occasion, and in a second instance he helped another conspirator do the same. Ultimately, Dexter Erby sent some ten to fifteen kilograms of cocaine to the Muncie area through Federal Express, three to five kilograms of which was in the form of crack.

Eventually, the authorities were led to Rodgers and his co-conspirators when Rodgers' co-workers at Federal Express began to notice a series of suspicious packages with handwritten air bills being shipped from New York to vacant residences in the Muncie area. In early September 1994, the Muncie Delaware County Drug Task Force intercepted one of the packages and ascertained that it contained some 177.6 grams of powder cocaine. In mid-November, task force members seized another of the packages and discovered some 54.7 grams of powder cocaine inside. In early December, they effected a controlled delivery of yet another package to a vacant residence and left the package on the front door. Hours later, two of the conspirators arrived at the house and picked up the package. They were followed and arrested a short time later at a Dairy Queen. The first members of the conspiracy

to be indicted chose to plead guilty and cooperate with the authorities by providing the information that led to the indictment of Rodgers and others.

A grand jury indicted Rodgers for conspiring to possess cocaine and cocaine base with the intent to distribute, and he was tried twice on that charge. The jury that heard the first trial could not agree on a verdict as to Rodgers and co-defendant Gary Mason. The government then dropped its case against Mason, and Rodgers was tried a second time alone. Following three days of testimony and argument, the jury found him guilty.

Judge Tinder's determination at sentencing that Rodgers was responsible for 250 grams of crack cocaine and 349 grams of powder cocaine resulted in a base offense level of 34. Finding that Rodgers was a minimal participant in the conspiracy, the judge granted him a four-level reduction pursuant to Guidelines section 3B1.2(a). The final, adjusted offense level of 30, coupled with Rodgers' lack of a criminal history, yielded a sentencing range of 97 to 121 months. However, as we have noted, the attribution of 250 grams of crack cocaine to Rodgers triggered the minimum prison term of ten years mandated by 21 U.S.C. sec. 841(b)(1)(A)(iii) for drug offenses involving 50 or more grams of cocaine base. Judge Tinder imposed the minimum prison term of 120 months, to be followed by a five-year period of supervised release.

The total of 250 grams of crack cocaine that the district judge attributed to Rodgers was based on two separate transactions testified to by Dexter Erby. The first occurred around the Easter holiday in 1994. Dexter Erby had brought 125 grams of crack from New York to Muncie for his cousin Demetrius Erby to distribute. At Rodgers' home, in the presence of Rodgers and Demetrius, Dexter weighed and separated the cocaine into five packages that each contained about 25 grams. While Dexter was performing that task, Demetrius and Rodgers discussed to whom they would sell the crack. Tr. 174-77; see also Sentencing Tr. 36. One to two weeks later, Dexter was preparing to ship another quantity of crack cocaine (between 125 and 150 grams) from New York to Muncie. Rodgers and Demetrius, both of whom were in New York, discussed that shipment with Dexter at his mother's home. Federal Express was used as the means for conveying this cocaine, and in fact it was shortly after this shipment that Dexter Erby began to use Federal Express as the exclusive means of delivering the cocaine to Muncie. Tr. 179-82.

Rodgers, who testified in his own defense at trial, denied any involvement in the conspiracy. He specifically denied any knowledge of or involvement with these two transactions. However, Judge Tinder, who noted that Rodgers' exculpatory testimony conflicted with that of a number of other witnesses, Sentencing Tr. 41, found Dexter Erby's testimony to be credible, id. at 36.

II.
A.

The mandatory ten-year prison term called for by section 841(b)(1)(A)(iii) was triggered by the finding that Rodgers was responsible for at least 250 grams of crack cocaine. That finding, as we have explained, was rendered by the district judge at sentencing, based on a preponderance of the evidence. The indictment against Rodgers did not allege that he was responsible for any particular amount of a controlled substance, and the jury that convicted him was not instructed to decide whether the amount of crack cocaine reached the threshold of 50 or more grams of cocaine base specified in section 841(b)(1)(A)(iii). Rodgers contends that the application of the ten-year mandatory minimum based on a key fact--the relevant drug quantity--that the jury did not find beyond a reasonable doubt cannot be squared with the Supreme Court's decision in Apprendi.

The Court in Apprendi reaffirmed the view it had expressed just one year earlier in Jones v. United States, 526 U.S. 227, 119 S. Ct. 1215 (1999), that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 120 S. Ct. at 2362-63; see Jones, 526 U.S. at 243 n.6, 119 S. Ct. at 1224 n.6. At issue in Apprendi was New Jersey's hate crimes law, which provided for an enhanced sentence when the sentencing judge found, by a preponderance of the evidence, that the defendant committed a crime with a purpose to intimidate a person or group because of race, color, gender, handicap, religion, sexual orientation, or ethnicity. Mr. Apprendi was arrested after he fired several shots into the home of an African-American family that had moved into a formerly all-white neighborhood. He eventually pleaded guilty to, inter alia, possessing a firearm with an unlawful purpose, an offense that carried a prison term of five to 10 years. At sentencing, however, the trial judge found that Apprendi's crime was motivated by racial bias. Pursuant to the State's hate crime statute, that determination had the effect of increasing the

applicable prison term to a range of 10 to 20 years. Because the finding that the defendant committed a crime with an intent to intimidate raised the maximum sentence to which he was subject, the Supreme Court concluded that the defendant's purpose in committing a crime was an essential element of the hate crimes offense, and as such must be submitted to the jury and proven beyond a reasonable doubt. See id. at 2363-67.

In the wake of Apprendi, it is clear that any finding as to a drug quantity that has the effect of increasing the statutory maximum prison term to which the defendant is subject must be charged and submitted to the jury. See, e.g., United States v. Nance, 236 F.3d 820, 825 (7th Cir. 2000). The default maximum prison term under section 841(b) for Schedules I and II controlled substances (cocaine is a Schedule II controlled substance, see 21 U.S.C. sec. 812(c)) is 20 years. See 21 U.S.C. sec. 841(b)(1)(C). Therefore, because the jury in Rodgers' case was never asked to find him responsible for any particular drug amount, that is the maximum prison term to which he could be sentenced.

But what of minimum prison terms? For persons without a criminal history including specified offenses, there is no default minimum period of incarceration specified by section 841(b). Thus, insofar as the statute is concerned, if the quantity of controlled substance for which the defendant is found responsible is small enough, he or she could be sentenced to no prison time at all. See sec. 841(b)(1)(C) (specifying a default maximum term of 20 years, but no minimum). The drug quantity ascertained by the district judge in this case increased the minimum term that Rodgers must serve to 10 years. Consequently, in terms of the punishment that the statute requires, the quantity finding had a dramatic impact on Rodgers' sentence. One can certainly argue, as Rodgers does, that a sentencing determination that increases the minimum prison term in this way ought to be treated as an essential element of the offense, to be assessed by the jury, in the same way that findings which affect the maximum term are under Apprendi. See 120 S. Ct. at 2379-80 (Thomas, J., concurring); id. at 2385-86 (O'Connor, J., dissenting).

But here Rodgers' argument runs headlong into McMillan v. Pennsylvania, 477 U.S. 79, 106 S. Ct. 2411 (1986), which the Court in Apprendi expressly declined to overrule. McMillan sustained a state sentencing statute which mandated a minimum prison term of five years for someone convicted of one of a number of specified felonies when the sentencing judge determined, by a preponderance of the evidence, that the

defendant had "visibly possessed a firearm" in the course of the offense. The petitioners in that case argued that because the possession of a firearm exposed them to a lengthier minimum prison term, it was an essential element of the offense that must be submitted to the jury and proved beyond a reasonable doubt. The Supreme Court disagreed, reasoning principally that the finding as to a defendant's possession of a gun had the effect of limiting the sentencing court's discretion to impose a sentence within the range of available choices. Id. at 87-88, 106 S. Ct. at 2417. In other words, a court's finding as to gun possession did not increase the maximum sentence to which the defendant was exposed, it simply narrowed the range of permissible sentences at or below that maximum. Ibid. The Court in Apprendi thus saw no need to disturb McMillan: "We do not overrule McMillan. We limit its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict--a limitation identified in the McMillan opinion itself." Id. at 2361 n.13.

In view of the Court's unwillingness to overrule McMillan, Apprendi's holding can be understood to impose a limit only on those factual determinations that potentially will increase the statutory maximum sentence to which the defendant is subject. Indeed, we made precisely this observation in Nance: "the Apprendi rule applies only to drug quantities that permit a sentence in excess of the default statutory maximum of twenty years." 236 F.3d at 825; see also United States v. Huerta, 239 F.3d 865, 876 (7th Cir. 2001); United States v. Williams, 238 F.3d 871, 877 (7th Cir. 2001); Talbott v. Indiana, 226 F.3d 866, 869 (7th Cir. 2000).

Nonetheless, Rodgers insists that one aspect of Apprendi's rationale leaves the door open to sentencing relief in his case. As he points out, a circumstance that the Supreme Court found worthy of mention in Apprendi was that the increase in the maximum prison term pursuant to New Jersey's hate crimes statute had the effect of transforming a second-degree offense into a first-degree offense under the State's criminal code. 120 S. Ct. at 2365. That consequence was more than nominal, in the Court's view:

The degree of criminal culpability the legislature chooses to associate with particular, factually distinct conduct has significant implications both for a defendant's very liberty, and for the heightened stigma associated with an offense the legislature has selected as worthy of greater punishment.

. . . Both in terms of absolute years behind bars, and because of the more severe stigma attached, the differential here is unquestionably of constitutional significance.

Id. In this case, Rodgers argues, the default statutory sentencing range of 0 to 20 years set forth in section 841(b)(1)(C) corresponds to a class C felony, while the range of 10 years to life set forth in section 841(b) (1)(A)-- triggered by, inter alia, a finding that the defendant was responsible for 50 or more grams of cocaine base--corresponds to a class A felony. See 18 U.S.C. sec. 3559(a). Thus, as he sees it, the drug quantity finding in his case has rendered his offense more serious in degree and stigma just as was true in Apprendi, notwithstanding the fact that it was the minimum prison term that came into play here, rather than the maximum.

Yet, it is the maximum prison term to which the defendant is subject that matters in terms of categorizing the gravity of the offense. The very classification statute to which Rodgers points, 18 U.S.C. sec. 3559(a), defines each class of felony with reference to the maximum term rather than the minimum. It is true that the provisions of section 841(b)(1)(A), which were triggered by the district court's finding, specify a maximum term of life, and that maximum corresponds to a Class A felony. See 18 U.S.C. sec. 3559(a)(1). Yet, Apprendi and its progeny make clear that in the absence of an appropriate drug-quantity determination by the jury, Rodgers could not have been sentenced in excess of the maximum prison term of 20 years specified by section 841(b)(1)(C). That default maximum, as we have noted, corresponds to a Class C felony. See 18 U.S.C. sec. 3559(a)(3). In effect, then, the district judge's drug quantity finding narrowed the statutory sentencing range for Rodgers from a period of 0 to 20 years to a period of 10 to 20 years. Because it is the maximum term that matters in terms of the categorization of federal offenses, the triggering of the 10-year minimum here did not have the effect of transforming Rodgers' offense into one more serious in degree as was true in Apprendi. See Williams, 238 F.3d at 877.

We of course appreciate the very real impact that the district court's quantity determination had upon Rodgers' sentence. Absent the statutory minimum triggered by that finding, Rodgers could have been sentenced to a term as short as 97 months under the Sentencing Guidelines. Once section 841(b)(1)(A) came into play, however, a sentence of at least 120 months--nearly two years

greater than the low end of the Guidelines range--was compulsory. Yet, essentially the same situation was presented to the Supreme Court in McMillan, and the Court's opinion in Apprendi leaves no doubt that McMillan remains good law insofar as mandatory minimum terms are concerned. Indeed, since Apprendi was decided, we have specifically rejected the notion that a factual determination which has the effect of triggering a mandatory minimum sentence constitutes an element of the offense that must be submitted to the jury. See United States v. Sandoval, 241 F.3d 549, 550-51 (7th Cir. 2001); Williams, 238 F.3d at 877; United States v. Smith, 223 F.3d 554, 565-66 (7th Cir. 2000), petitions for cert. filed, (U.S. Nov. 14, 2000) (No. 00-7070), (Nov. 15, 2000) (No. 00-7021), (Nov. 15, 2000) (No. 00-7085), (Jan. 16, 2001) (No. 00-8082). Williams decided this issue on facts similar to those presented here.

For all of these reasons, we must reject Rodgers' contention that the mandatory minimum prison term imposed by section 841(b)(1)(A) cannot be imposed in the absence of a jury determination as to the relevant drug quantity. We also take the opportunity to point out, as we did in Williams, that our decision in this respect is in accord with the holdings of our sister circuits. See United States v. LaFreniere, 236 F.3d 41, 49-50 (1st Cir. 2001); United States v. Hishaw, 235 F.3d 565, 577 (10th Cir. 2000); United States v. Pounds, 230 F.3d 1317, 1319-20 (11th Cir. 2000) (per curiam), petition for cert. filed, (U.S. March 3, 2001) (No. 00-8876); United States v. Keith, 230 F.3d 784, 787 (5th Cir. 2000) (per curiam), cert. denied, 121 S. Ct. 1163 (2001); United States v. Aguayo-Delgado, 220 F.3d 926, 933-34 (8th Cir.), cert. denied, 121 S. Ct. 600 (2000).

B.

Rodgers also argues that Judge Tinder's decision to attribute 250 grams of crack cocaine to him is flawed, because it necessarily rests wholly on Dexter Erby's testimony. That testimony was uncorroborated and, in Rodgers' view, inconsistent with the balance of Dexter's testimony as well as the testimony of other witnesses. For example, although Dexter claimed that Demetrius and Rodgers were discussing the distribution of the crack cocaine while he was separating the cocaine in Rodgers' bedroom around the 1994 Easter holiday, see Tr. 174-77, neither Dexter nor the other members of the conspiracy who testified identified Rodgers as one of Dexter's sellers of cocaine in Muncie. See, e.g., Tr. 169-72, 396. Demetrius Erby, in fact, disclaimed any drug-dealing relationship with

Rodgers, and could not recall Rodgers ever having been present during the packaging of cocaine and the like. Tr. 244, 264, 267-68, 275, 276. Similarly, with respect to the second 125-gram quantity of crack, although Dexter contended that Rodgers was present in New York when he discussed that shipment with Demetrius, Tr. 179-81, Demetrius himself testified that he had never gone to New York with Rodgers, Tr. 268. Dexter Erby received a reduced sentence of 135 months in exchange for his cooperation with the government, Rodgers points out, and thus had a motive to exaggerate Rodgers' level of involvement in the conspiracy.

Having reviewed the relevant testimony, however, we find nothing which precluded Judge Tinder from crediting Dexter's testimony. His testimony was not self-contradictory in any significant respect. To the extent it conflicted with the more exculpatory version of Rodgers' involvement offered by Demetrius Erby and by Rodgers himself, the district judge was free to credit Dexter. That Dexter was a convicted felon who stood to gain from his testimony against Rodgers is by no means a remarkable circumstance. E.g., United States v. Meyer, 234 F.3d 319, 326 (7th Cir. 2000), petition for cert. filed, (March 2, 2001) (No. 00-1442). The record reflects that Judge Tinder carefully and methodically considered the evidence bearing on the drug amounts for which Rodgers was responsible. We can find nothing that would call into question his decision to credit Dexter Erby's testimony with respect to the 250 grams of crack cocaine for which Rodgers was held to account. See, e.g., United States v. White, 240 F.3d 656, 661 (7th Cir. 2001) (sentencing court's credibility determinations are entitled to special deference).

III.

For all of the reasons discussed above, we AFFIRM Rodgers' sentence. We thank Rodgers' appointed counsel for his vigorous advocacy on Rodgers' behalf.