# United States Court of Appeals

## For the First Circuit

No. 99-1790

UNITED STATES OF AMERICA,

Appellee,

v.

MARCOS MARTÍNEZ-MEDINA,

Defendant, Appellant.

_____

No. 99-1999
No. 01-1318

UNITED STATES OF AMERICA

Appellee,

v.

MANUEL PÉREZ-COLÓN,

Defendant, Appellant.

_____

No. 99-2080

UNITED STATES OF AMERICA,

Appellee,

v.

ANGELA AYALA-MARTÍNEZ,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, <u>U.S. District Judge</u>]

———————————

Before

Boudin, <u>Chief Judge</u>,

Kravitch,[*] <u>Senior Circuit Judge</u>,

and Torruella, <u>Circuit Judge</u>.

———————————

<u>Judith H. Mizner</u> for appellants Manuel Pérez-Colón and Angela Ayala-Martínez.
<u>Law Offices of John E. Bergendahl</u> on brief for appellant Angela Ayala-Martínez.
<u>Irma R. Valldejuli</u> for appellant Marcos Martínez-Medina.
<u>Sonia I. Torres</u>, Assistant United States Attorney, with whom <u>Guillermo Gil</u>, United States Attorney, <u>Jorge E. Vega-Pacheco</u>, Assistant United States Attorney, Chief, Criminal Division, and <u>Nelson Pérez-Sosa</u>, Assistant United States Attorney, were on brief for the United States.

———————————

February 8, 2002

———————————

———————————

[*]Of the Eleventh Circuit, sitting by designation.

BOUDIN, Chief Judge. This set of appeals grows out of an indictment alleging that the appellants, along with 76 others, were part of a sprawling drug smuggling and distribution network in southwest Puerto Rico between 1994 and 1997. The two-count indictment charged Angela Ayala-Martinez ("Ayala") and Manuel Perez-Colon ("Perez") with conspiracy to possess and distribute multi-kilogram amounts of cocaine, heroin, and marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1994) and conspiracy to engage in illegal financial transactions involving the drug proceeds in violation of 18 U.S.C. §§ 1956(a)(1) and 1957 (1994). Perez's money laundering charge under 18 U.S.C. § 1957, but not § 1956(a)(1), was later dropped. Appellant Marcos Martinez-Medina ("Martinez") was charged only with participating in the drug conspiracy.

The three appellants were tried along with four other co-defendants: Manuel Garcia-Torres ("Manuel"), his brother Andres Garcia-Torres ("Andres"), Walter Batiz, and Deri Ventura. The evidence presented during the forty-day trial was extensive,[1] and featured the testimony of several indicted co-conspirators

---

[1]The evidence presented at trial was far more extensive and therefore differed in some respects from the evidence presented in the case against Jaime Garcia-Torres, who was tried separately for related offenses. See United States v. Garcia-Torres, ___ F.3d ___ (1st Cir. 2002).

who agreed to cooperate with the government in exchange for leniency.

In brief, it showed that in 1995, Ayala obtained a contact with a Colombian dealer, Jorge Alicea-Serrano (a/k/a "Jockey"), to import large quantities of cocaine into Puerto Rico. The drugs were delivered by air and by sea, and Ayala hired others--including Andres Garcia, Perez, Batiz, and Ventura--to retrieve them for her.

By virtue of her connection to Jockey, Ayala rose from a small-time drug dealer to a major supplier to various drug distribution points at housing projects in the city of Ponce. Among them were drug points at Los Lirios Del Sur and Santiago Iglesias, owned by Perez; La Atocha and Tibes, owned by Edwin Melendez Negron (a/k/a "Danny Gongolon"); and La Cantera, owned by the Garcias' older brother Tommy Garcia-Torres until his death in August 1995, when it was inherited by Manuel Garcia and Ventura. Batiz worked for Garcia and Ventura cutting drugs at La Cantera.

Disputes at these drug points led to several violent killings, which were not charged as crimes but were important to the government's case both as conspiratorial acts and factors in sentencing. According to the testimony of a cooperating witness named Daniel Sanchez-Ortiz, in or around 1996 Perez ordered the

murder of Sol Garcia, owner of a competing drug point at Los Lirios del Sur that was threatening Perez's sales.

At La Cantera, an internecine feud erupted in 1994 when Tommy Garcia fired "Gerardito", his brother-in-law and drug runner, because he allegedly stole $35,000 to $40,000 in drug proceeds. After being ostracized from La Cantera, Gerardito and his brother Nelsito began associating with Michael Vazquez and his father Eddie; the Vazquezes owned a jewelry store and had no demonstrated connection to the drug trade but had weapons and were willing to help Gerardito seek revenge against the Garcias. A war soon erupted between the Garcias and their allies-- including Ventura, Ayala, and Gongolon--and Gerardito and his faction--which included Nelsito, the Vazquezes, and the Vazquezes' jewelry store employee, Jose Negron-Santiago (a/k/a "Bejumen").

A series of violent incidents ensued between the two factions. In 1995 Tommy Garcia and his trigger man, Abraham Borgos Santiago, were killed in separate incidents, as was "Gordo", a friend of Gerardito and Nelsito. Each side pinned blame on the other. In 1996, Eddie Vazquez shot and wounded Danny Gongolon. On numerous occasions throughout this period, the Garcias tried to find and kill Gerardito, Nelsito, the Vazquezes, and Bejumen.

On February 14, 1997, Bejumen and his wife Rosemarie were shot and killed in their car. Gamaliel Goglas-Valentin, who worked part time for the Garcias at La Cantera and also helped them store guns, testified that Andres, Manuel, and Marcos Martinez drove into the auto shop where he was working and celebrated openly that they had "finally" killed Bejumen. As Andres described it, the three of them ambushed Bejumen's car; Martinez and Andres then opened the door and shot Bejumen and his wife repeatedly at close range.

Four days later, Ayala, Manuel, Danny Gongolon, and Ventura paid $20,000 to hire kidnappers to pose as policeman and "arrest" Michael Vazquez. Although the testimony of various witnesses is somewhat unclear as to the precise chain of events, it appears that the kidnappers handed Michael Vazquez over to associates of the Garcia group--including Manuel and Andres Garcia, Gongolon, Ventura, and Batiz--who drove away with him and killed him. They also found and shot Eddie Vazquez. Ayala was described as celebrating when she was told that the plan had been successfully executed.

The appellants were convicted as charged. Ayala and Perez were sentenced to life imprisonment on the drug conspiracy count and 20 years' imprisonment on the money laundering count,

to be served concurrently; Martinez was sentenced to 405 months' imprisonment.  These appeals ensued.

The appellants' various claims can be grouped into several categories: sufficiency of the evidence as to certain counts, admissibility of specific evidence, alleged prosecutorial misconduct, improper jury instructions, sentencing rulings, and new trial claims based on new or withheld evidence. We affirm the appellants' convictions and sentences in all respects.

## I.  SUFFICIENCY OF THE EVIDENCE

Single versus multiple conspiracies.  All three appellants argue that the evidence was insufficient to support aspects of their convictions.  The first sufficiency issue, raised by Ayala and Perez, is the frequently raised but often misunderstood claim that a single conspiracy found by the jury was in fact multiple, independent conspiracies.[2]  If there was such "variance" between the indictment and the proof at trial, it might be grounds for reversal if it substantially prejudiced the defendants' rights by, for example, allowing the jury to transfer evidence of one conspiracy against defendants involved

---

[2]Because the defendants did not challenge the jury instructions as to conspiracy, we review the issue for evidentiary sufficiency only. United States v. Mena-Robles, 4 F.3d 1026, 1033 (1st Cir. 1993), cert. denied, 511 U.S. 1035 (1994).

in another.  Kotteakos v. United States, 328 U.S. 750, 774 (1946); United States v. Glenn, 828 F.2d 855, 858 (1st Cir. 1987); see generally 4 LaFave, Israel & King, Criminal Procedure § 19.6 (2d ed. 1999).

Appellants make two different so-called "variance" arguments.  The first focuses on the possibility that some people charged in the indictment but not tried together with the defendants might not have been implicated in the same conspiracy--in particular, other drug point owners whose association with Ayala and the Garcias may have been more tangential.  But the government need not show that every person indicted was a member of the conspiracy.  United States v. Townsend, 924 F.2d 1385, 1389 (7th Cir. 1991).  At most, questions may arise whether the introduction of evidence as to these other individuals' actions was unfairly prejudicial to the defendants.  United States v. Mojica, 185 F.3d 780, 785-86 (7th Cir. 1999).  But the appellants make no sustained argument as to unfair prejudice.

Appellants' main "variance" claim is that not all of those tried together were engaged in the single charged conspiracy.  This is essentially a challenge to the sufficiency of the evidence.  Townsend, 924 F.2d at 1389.  As in all sufficiency claims, we take the evidence, including issues of

credibility, in the light most favorable to the government and ask whether a rational jury could easily find guilt beyond a reasonable doubt.  United States v. Moran, 984 F.2d 1299, 1300 (1st Cir. 1993).

The touchstone of conspiracy is an agreement to do an unlawful act, Iannelli v. United States, 420 U.S. 770, 777 (1975), but each coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it.[3] The jury may infer an agreement circumstantially by evidence of, inter alia, a common purpose (such as a purpose to sell illicit drugs), overlap of participants, and interdependence of various elements in the overall plan.[4]

Putting aside Martinez (who raises a separate claim that we address below), the evidence permitted the jury to find that the appellants and their co-defendants were engaged in a single drug conspiracy.  The Garcias, Ventura, and Batiz all

_____

[3]United States v. Garcia-Rosa, 876 F.2d 209, 223 (1st Cir. 1989), cert. denied, 493 U.S. 1030, vacated on other grounds sub nom. Rivera-Feliciano v. United States, 498 U.S. 954 (1990); United States v. Giry, 818 F.2d 120, 127 (1st Cir.), cert. denied, 484 U.S. 855 (1987); United States v. Drougas, 748 F.2d 8, 17 (1st Cir. 1984).

[4]See United States v. Rivera-Ruiz, 244 F.3d 263, 268 (1st Cir. 2001); United States v. Randazzo, 80 F.3d 623, 629 (1st Cir. 1996); see also 2 LaFave & Scott, Substantive Criminal Law § 6.4(d) (1986).

engaged in a joint venture--the La Cantera drug point--whose main supplier was Ayala. Ayala supplied the drugs and profited from their resale, while the Garcias, Ventura, and Batiz ran the resale operation and took steps--often violent--to protect it. This ongoing operation could be found to constitute a conspiracy. See United States v. Ortiz De Jesus, 230 F.3d 1, 5 (1st Cir. 2000).

Perez was not involved in the operations of the La Cantera drug point but instead operated his own drug points at Los Lirios del Sur and Santiago Iglesias. Were this Perez's only connection to Ayala, it might be arguable that Perez was not part of the same conspiracy as the La Cantera operators. In a case where a common supplier is the sole link between diverse distributors, it may be more difficult to sustain a finding of common agreement, see, e.g., Kotteakos, 328 U.S. at 754-56; Glenn, 828 F.2d at 858, although even then one could be inferred by additional evidence--e.g., a finding that the various distributors depended on one another for the health of their own drug business, see United States v. Portela, 167 F.3d 687, 697 (1st Cir. 1999).

In this case, not only was Perez one of Ayala's distributors, but he directly aided Ayala by helping her retrieve the drugs from Jockey, Ayala's aforementioned Colombian

contact.  From there, Perez distributed the drugs to the drug points per Ayala's instructions.  This evidence is more than sufficient to show that Perez was in a single conspiracy with Ayala and the La Cantera operators to distribute narcotics.

Evidence as to Martinez.  Martinez argues separately that even if the other co-defendants were part of a single drug conspiracy, he was not part of it.  Martinez paints himself as a "hired gun" who participated in the murder of Bejumen Santiago at the behest of the Garcias but did not share or even know of their purpose to promote the drug operations.

There is evidence that Martinez was directly involved in drug dealing.  Goglas testified that Martinez worked for Julio Teta, a friend of Manuel Garcia who was starting a new drug point at Guanica.  Teta, usually accompanied by Martinez, went to Goglas' house almost every day to pick up drugs from Garcia for the drug point.  Perhaps this evidence would suffice for the jury to infer that through these repeated purchases of drugs for resale, Martinez joined the Garcias' drug enterprise. See United States v. Rivera-Ruiz, 244 F.3d 263, 270 (1st Cir. 2001).

We need not decide this issue, however, because here there is clearer evidence of agreement.  Sometime prior to February 1997, Teta agreed to help Garcia in his conflict with

-11-

Gerardito in exchange for help with some problems he was having at the Guanica drug point. The evidence that Martinez was regularly involved in drug dealing with Teta provides a reasonable basis for the jury to infer that he also knew about the working arrangements between Teta and Garcia; this is the most straightforward way to explain how he came to assist Garcia, for whom he did not otherwise work, in carrying out the murder of Bejumen--which (as will be seen) can be deemed a part of the larger conspiracy.

This inference is reinforced by the fact that on another occasion Teta and Martinez unsuccessfully went out to find and kill Nelsito and Gerardito using guns supplied by Manuel Garcia. Based on this evidence--Teta's pact with Manuel Garcia, Martinez's relationship with Teta, and Martinez's overt acts on behalf of Manuel Garcia--a jury could reasonably infer that Martinez agreed to join the Garcias' drug operation in the capacity of an enforcer.

Virtually all of the evidence linking Martinez to the conspiracy came in through the testimony of Goglas,[5] and Martinez argues that the uncorroborated testimony of a government

_____

[5]Danny Gongolon also testified that he had seen Martinez at Ayala's house on several occasions (including a barbecue party) before the murder of Bejumen, but Gongolon's testimony provided no specific information about the substance of Martinez and Ayala's relationship.

-12-

informant is not enough to convict.  That argument runs contrary to the law of this circuit, which leaves in the hands of the jury decisions about credibility of witnesses "so long as the testimony is not incredible or insubstantial on its face." United States v. Andujar, 49 F.3d 16, 21 (1st Cir. 1995) (quotations omitted).

Perez's money laundering conviction. Perez appeals the denial of his motion for a judgment of acquittal on the money laundering conspiracy count.  The government replies that Perez conspired with Ayala to engage in a financial transaction designed to conceal the unlawful proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (1994).  Specifically, the government on appeal relies on an incident in which Ayala had her drug point employee Hector Dominicci install air conditioning units in Perez's house.  Ayala paid Dominicci between $8,000 and $10,000 in cash, which she retrieved from the house of her friend Maria Barbosa, who routinely hid drug money for her.

To prove a money laundering conspiracy under 18 U.S.C. § 1956(a)(1)(B)(i), the government must show that Perez agreed to have the air conditioners installed knowing both that they were paid for with illegal proceeds and that the transaction was "designed, in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control

-13-

of the proceeds . . . ."  Where the defendant is someone other than the source of the illegal proceeds (here, Perez), the statute is concerned with his knowledge of the source's intent in the transaction.  United States v. Campbell, 977 F.2d 854, 857-58 (4th Cir. 1992); see also United States v. Frigerio-Migiano, 254 F.3d 30, 33 (1st Cir. 2001).

Perez objects that there is no evidence that Ayala used the air conditioners to conceal her drug money or that he knew of Ayala's intent.  Concededly there is no direct evidence of Ayala's intent in this transaction.  But the evidence indicates at least two other transactions between Ayala and Dominicci that support an inference of pattern.  In 1995 Ayala gave Dominicci $30,000 in small bills and had him buy a Ford Explorer for her in the name of his air conditioning company.  She also paid him about $16,000 in cash for a Mazda that was registered to Dominicci's sister. Dominicci used the money to pay off the balance on the car; the registration was never changed after the sale.

Purchasing large items with drug money through third parties surely supports an inference of intent to conceal.  See United States v. Westbrook, 119 F.3d 1176, 1191 (5th Cir. 1997), cert. denied, 522 U.S. 1119 (1998); United States v. Cisneros, 112 F.3d 1272, 1283 (5th Cir. 1997).  And Ayala's intent in

-14-

these automobile purchases could fairly justify a jury's conclusion that the air conditioners were also part of Ayala's concerted effort to conceal the drug proceeds.

As to Perez's knowledge, he was intimately involved in Ayala's drug operations, both helping Ayala retrieve the drugs from Jockey and helping distribute them to the drug points. He also ran two drug points of his own. Perez's deep involvement in Ayala's drug business is enough for a jury to find beyond a reasonable doubt that when Perez agreed to have the air conditioners installed, he knew that Ayala was using them to conceal her drug money.

## II.  ADMISSION OF SPECIFIC EVIDENCE

Evidence of the murders.  Appellants object to the admission of specific pieces of evidence introduced at trial. Martinez argues that the evidence of the Bejumen and Vazquez murders was unfairly prejudicial and irrelevant because they had no relationship to the drug conspiracy. See Fed. R. Evid. 403; United States v. Gonsalves, 668 F.2d 73, 75 (1st Cir. 1982).

To the contrary, the Garcias sought to kill Bejumen because he was associated with Gerardito, who had allegedly stolen from the Garcias' drug point. Bejumen was apparently neither involved in the drug trade nor took any particular actions to threaten the Garcias's drug interests; but the

-15-

evidence revealed a pattern of murders originating in the drug conspiracy, directed against mere friends and relatives of rivals, which the jury could find were to discourage and undermine such rivals.

There was even more evidence presented at trial linking the Vazquez murders to the drug conspiracy. While Bejumen may have been killed for purely retributive reasons, there is substantial evidence that the Vazquezes posed a more immediate threat to Garcias's future interests at La Cantera. After the feud between Gerardito and the Garcias erupted, Michael Vazquez began to shoot at Gongolon's drug point at La Atocha and the Garcias' drug point at La Cantera, which depressed drug sales. The Garcias thus targeted the Vazquezes not only to get back at Gerardito, but to protect the profitability of the drug conspiracy. The admission of the murders was relevant and not unfairly prejudicial.

Co-conspirator hearsay statements. Much of the government's proof rested on hearsay statements that were admitted in evidence under the co-conspirator exception, which exempts from the hearsay rule statements "by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). The district court found at the close of the evidence that the statements more likely than not

satisfied the requirements of the rule.  See United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977); accord Bourjaily v. United States, 483 U.S. 171, 175 (1987).  Ayala and Perez allege error as to eight particular statements on the ground that they were not made "in furtherance" of the conspiracy.  Our review is for clear error.  United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993).

Although its rationale is sometimes deemed shaky, "the co-conspirator exception to hearsay is of long standing and makes a difficult-to-detect crime easier to prove."  United States v. Goldberg, 105 F.3d 770, 775 (1st Cir. 1997).  As developed by the courts, the "in furtherance" requirement provides a limited exception for "idle conversations among criminal partners," as well as for statements clearly intended to foil rather than facilitate the criminal enterprise.  5 Weinstein, Federal Evidence § 801.34[5] (2d ed. 2001).  However, a statement need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way.  Id.

Six of the statements challenged by the appellants easily satisfy this requirement because they conveyed to other co-conspirators information about the operations of the drug conspiracy centering around Ayala: which drug points Ayala

supplied, the means by which she retrieved the drugs from Jockey, and the role that Batiz played at La Cantera. Three of the statements indicate that Ayala supplied drugs to Gongolon and Antonio Gonzalez-Vega; two others are about Ayala's statements concerning the retrieval of drugs from the ocean; the sixth concerns Batiz's status as an employee of Ventura at La Cantera. See Sepulveda, 15 F.3d at 1180-81 (sharing of information about co-conspirators' roles and a conspiracy's mode of operation); United States v. Munson, 819 F.2d 337, 341 (1st Cir. 1987) (identification of co-conspirator as source of cocaine).

The final two statements--admissions by "Eleizer" to Gongolon and Goglas that he killed "Joito El Orejon"--are more debatable. Eleizer was Gongolon's bodyguard and worked at his drug point at Tibes. Gongolon testified that he told Eleizer he was upset with Orejon for trying to sell a stolen car at Tibes, fearing it would "heat up" the drug point. When Eleizer responded that he wanted to kill Orejon, Gongolon advised him to wait until Orejon left Tibes. After the killing, Eleizer told Gongolon how the shooting occurred. On this version of the facts, Eleizer's statements to Gongolon were undoubtedly in furtherance of their drug conspiracy, since he and Gongolon were

discussing strategies for dealing with the threat posed by Orejon to the Tibes drug point.

Goglas, however, testified that Ayala had Eleizer kill Orejon because Orejon had stolen some jewelry and money from Ayala's friend Jose Velazquez. This version of the facts is friendlier to the appellants, since it makes the murder--and consequently Eleizer's admission to it--less clearly relevant to the drug conspiracy. Although there is scant evidence as to which version of the facts is accurate (perhaps both are), we cannot say that the district court clearly erred in concluding that Eleizer's admissions were more likely than not in furtherance of the drug conspiracy.

Moreover, even if there was error in admitting these final two statements, it was patently harmless. Here the evidence as to the appellants' participation in the conspiracies was strong, and it is highly improbable that the statements about Eleizer's role in a murder that was at best peripheral to the prosecution's case affected the verdict. United States v. Tse, 135 F.3d 200, 209-10 (1st Cir. 1998).

## III. PAYMENTS TO WITNESSES

Gamaliel Goglas, the main witness implicating Martinez in the conspiracy, was paid $9,000 in return for his cooperation in the government's case. Goglas testified that he decided to

cooperate with the government because he began to fear for his life after he robbed $23,000 from Ventura and that the payments were for his security while in Puerto Rico (hotel and travel expenses) and for his relocation (a one-way ticket from Puerto Rico). DEA Agent Lugo corroborated this testimony, although he admitted mistakenly indicating on a DEA form that the payment was for "information." Angela Castro, another cooperating witness, was paid $10,000 for relocation expenses for her and her husband.

Martinez argues that these payments compromised the integrity of his conviction and violated the federal witness bribery statute, 18 U.S.C. § 201(c)(2) (1994). As to the statutory issue, it is entirely doubtful that 18 U.S.C. § 201(c)(2) applies at all to the government, see United States v. Lara, 181 F.3d 183, 198 (1st Cir. 1999), but in all events Congress has explicitly authorized the Attorney General to provide for the relocation and protection of witnesses that may be in danger, see 18 U.S.C. § 3521 (1994) (Witness Relocation and Protection Act). It would be unreasonable to interpret 18 U.S.C. § 201(c)(2) as precluding a practice specifically authorized by a more specific and recent statute. See, e.g., Morton v. Mancari, 417 U.S. 535, 550-51 (1974).

-20-

Certain inducements to government witnesses may compromise a defendant's fair trial right wholly apart from section 201(c)(2). United States v. Murphy, 193 F.3d 1, 9 (1st Cir. 1999); see United States v. Dailey, 759 F.2d 192, 201 (1st Cir. 1985). But certainly security-related expenses are a legitimate part of a prosecutor's arsenal, at least as long as certain procedural safeguards--such as disclosure of the arrangement to the parties and cautionary jury instructions--are maintained. See United States v. Innamorati, 996 F.2d 456, 482 & n.11 (1st Cir.), cert. denied, 510 U.S. 955 (1993); United States v. Cresta, 825 F.2d 538, 546 (1st Cir. 1987), cert. denied, 486 U.S. 1042 (1988).

Here the payments to Goglas were a relatively small amount and, despite the apparent mistake in notation by the DEA agent, designed specifically for protection and relocation expenses. The defense cited such payments to argue bias to the jury as its main defense theory. And the district judge instructed the jury that they should approach the testimony of these witnesses "with particular caution." All of this lay well within constitutional bounds. See United States v. Wilson, 904 F.2d 656, 659-60 (11th Cir. 1990), cert. denied, 502 U.S. 889 (1991).

IV.  PROSECUTION'S SUMMATION

-21-

All three appellants allege that the trial was tainted by improper remarks by the prosecutor in summation. Some were objected to; others were not. Although several of the remarks were highly improper, none calls for a new trial.

The appellants first object to the prosecutor's repeated and graphic references to the various murders described at trial, claiming that this inflamed the passions of the jury and distracted from the merits of the case. The trouble with this theory is that, as discussed in Part II above, the murders were a legitimate part of the government's case because they were overt acts of the conspiracy.

At several points, the prosecution appealed to the juror's "hearts and minds" and "conscience." The prosecutor told the jury that "your conscience must have been screaming at you, screaming at you that [the defendants] were guilty." Later, the prosecutor said that "if you know in your head and your heart that these defendants are guilty then you must return the only verdict that the evidence commands." These comments were plainly improper appeals to the jury's emotions and role as the conscience of the community. See Arrieta-Aggresot v. United States, 3 F.3d 525, 527 (1st Cir. 1993).

Nevertheless, these statements were immediately stricken, and when defense counsel later moved for a mistrial on

-22-

those grounds, the district court denied it and instructed the jury that they were to use their common sense and experience, not their emotions. Improper though the prosecutor's statements were, they are basically rhetoric rather than misstatements of evidence. We also give weight to the judgment of the trial judge, who was better able to assess the impact of the remarks on the jury, that they did not prejudice the outcome in light of the curative instruction and overwhelming evidence.

More disturbing was the prosecutor's characterization of the defendants as "hunting each other like animals" and killing one another "with no mercy." The reference to the defendants as animals is especially inflammatory and improper. See United States v. Hands, 184 F.3d 1322, 1332-33 (11th Cir. 1999) (improper to refer to defendant as "wickedly vicious man, monster, drug dealer"). Nevertheless, it is very difficult to believe that this single stray remark added anything significant to the depictions of the various murders by far more gruesome testimony and photographs. Thus, it seems to us highly implausible to think that this isolated epithet altered the jury's verdict.

As to the various misstatements of fact alleged by the appellants, most appear reasonably supported by the record or are within the prerogative of the prosecution to characterize

the evidence presented at trial and argue certain inferences to the jury.  United States v. Mount, 896 F.2d 612, 625 (1st Cir. 1990).  Any factual inaccuracies were minor, related to peripheral issues, and had no plausible prejudicial effect.

The appellants claim that the prosecutor improperly vouched for witnesses' credibility on several occasions.  The first statement--that the police returned certain seized money because they did not yet have Angela Castro's testimony to link it to Ayala--does not even arguably constitute a personal assurance as to Castro's credibility.

The second statement--that cooperating witnesses had a motive to tell the truth because of the dire consequences of breaking their plea agreements--was also not improper vouching because it provided a reason, not a personal assurance, why the jury should believe the witnesses.  United States v. Auch, 187 F.3d 125, 131 (1st Cir. 1999); see United States v. Rodriguez, 215 F.3d 110, 123 (1st Cir. 2000).  Moreover, it was an appropriate response to the defense's main theory, which was that the cooperating witnesses were lying to obtain leniency. See United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987); see also United States v. Young, 470 U.S. 1, 12-13 (1985).

A final set of statements were clearly improper. In its rebuttal, the government sought to support the credibility of four cooperating witnesses--Angela Castro, Antonio Gonzalez-Vega, Daniel Sanchez-Ortiz, and Kelvin Moro-Ortiz--by stating that they would have concocted more damaging stories if they had been lying in order to curry favor with the government. We have repeatedly held that this type of argument crosses the bounds of permissible conduct. See Auch, 187 F.3d at 132; United States v. Manning, 23 F.3d 570, 575 (1st Cir. 1994). As we stated in Auch, "prosecutors in this circuit should consider themselves well advised to strike such commentary from their repetoires." 187 F.3d at 132.

We do not condone the continuing disregard for our precedents by federal prosecutors in Puerto Rico. See, e.g., United States v. Gonzalez-Gonzalez, 136 F.3d 6, 10 (1st Cir. 1998) (citing cases); see also United States v. Capone, 683 F.2d 582, 586 (1st Cir. 1982) (noting that a new trial may be appropriate if "sanction is needed to deter future prosecutorial misconduct"). Here, the prosecutor's argument is all the more problematic given that it occurred in rebuttal, was not followed by a cautionary instruction, and occurred in a case that rested largely on the testimony of cooperating witnesses whose

credibility was crucial to determining guilt.  See Auch, 187 F.3d at 129, 132.

However, the prosecution's vouching extended to only four relatively minor witnesses; no claim is made that other key witnesses--specifically Gongolon, Goglas, and Dominicci--were improperly vouched for.  Their testimony, which was often corroborated by testimonial and tangible evidence, was more than enough to establish the drug conspiracy as to all appellants beyond reasonable doubt.  See United States v. Palmer, 203 F.3d 55, 59 (1st Cir. 2000).  Although the issue is close, the prosecutor's inexcusable remarks do not warrant a new trial.

Finally, the appellants claim that the prosecution improperly shifted the burden of proof by remarking to the jury that the defense failed to keep its promise in opening statement to ask certain questions about the drug trafficking relationship between Perez and Hector Dominicci.  Whether or not this remark crosses the line, see United States v. Savarese, 649 F.2d 83, 87 (1st Cir. 1981), the district judge removed any threat of prejudice by immediately striking the statement and clearly instructing the jury that the burden of proof beyond a reasonable doubt rested squarely with the prosecution.

V.  JURY INSTRUCTIONS

Ayala and Perez contend that the district court's refusal to give a "buyer-seller" jury instruction constitutes reversible error. Such an instruction would have informed the jury that a buyer and seller in a single drug transaction are not invariably part of a drug conspiracy. United States v. Moran, 984 F.2d 1299, 1302 (1st Cir. 1993). The classic example is a single sale for personal use and without prearrangement. Id. at 1302-04.

We noted in Moran that other variations on this classic case might raise additional problems, but we need not address any of them in this case. Appellants were entitled to the "buyer-seller" instruction only if the record, taken in the light most congenial to their theory of the case, could plausibly support it. United States v. Rodriquez, 858 F.2d 809, 812 (1st Cir. 1988). Here, overwhelming evidence showed that Ayala and Perez agreed to import drugs with the intent to distribute them, and engaged in repeated transactions of large quantities of narcotic drugs for resale. This evidence does not plausibly support a mere buyer-seller relationship.

VI. SENTENCING ISSUES

Ayala and Perez's sentencing claims. These two appellants challenge their sentences on several grounds, three of which are common to them both. As background, we start with

a description of Ayala and Perez's sentencing proceedings.  In accordance with settled practice at the time, United States v. Lindia, 82 F.3d 1154, 1160-61 (1st Cir. 1996), the court proceeded to determine the quantity of drugs involved in the offense.  Relying upon trial evidence, the court concluded that more than 150 kilograms of cocaine were involved in the conspiracy and fairly attributable to both Ayala and Perez.

This figure was far more than needed to trigger the statutory maximum life sentence, 21 U.S.C. § 841(b)(1)(A), and enough to set their guideline base offense levels at 38, the highest unadjusted level for drug crimes, U.S.S.G. § 2D1.1 (1998).  With a criminal history category of IV, Ayala was initially subject to a 324 to 405 month sentence, and Perez, with a criminal history category of III, was initially subject to a term of 292 to 365 months.  U.S.S.G. Ch. 5 Pt. A (sentencing table).

However, the court found that life sentences were mandated in each case for at least two reasons.  First, after making the requisite factual findings, the court applied two upward departures to each appellant's base offense level: a two-level increase for possession of a firearm, U.S.S.G. § 2D1.1(b)(1), and a four-level increase for being an organizer or

leader of the conspiracy, id. § 3B1.1. With these enhancements, Perez and Ayala were subject to life terms.

Second, as an alternative, the court applied U.S.S.G. § 2D1.1(d)(1)'s murder cross reference, which says that "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111" the sentencing court shall apply U.S.S.G. § 2A1.1. The court found, by a preponderance of the evidence, that Ayala was responsible for the murders of Joito el Orejon and Michael and Eddie Vazquez, and that Perez had ordered the murder of Sol Garcia. Accordingly, it increased their base offense levels to 43, as specified in section 2A1.1. The pair were again subject to life terms.

Third, the court determined that Ayala (but not Perez) was subject to a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A) because she had two or more prior drug felony convictions.

Finally, the court proceeded to sentence the appellants on the money laundering count. At the outset, the court declined to group the two counts of conviction under U.S.S.G. § 3D1.2 since the drug offenses involved murder and thus distinct victims and harms. It then calculated a combined base offense level of 43 and applied it to the money laundering conviction. U.S.S.G. § 3D1.4. The court then imposed a sentence of 20 years

on each Ayala and Perez, the maximum allowed by statute. 18 U.S.C. § 1956(a)(1).

First, Ayala and Perez say the district court violated their rights under Apprendi v. New Jersey, 530 U.S. 466 (2000), when it sentenced them to life in prison based on the court's determination of drug quantity. The default statutory maximum for the cocaine conspiracy would be 20 years if no quantity were determined; life imprisonment becomes the statute's maximum only where five kilograms or more is involved. Compare 21 U.S.C. § 841(b)(1)(C) with id. § 841(b)(1)(A). Ayala and Perez say, correctly, that under Apprendi quantity determinations that push the actual sentence imposed beyond the otherwise applicable statutory maximum must be determined by a jury beyond a reasonable doubt.

Although Ayala and Perez were sentenced in July and August of 1999, before Apprendi was decided in 2000, there is no bar to applying that decision now to their direct appeals. United States v. Barone, 114 F.3d 1284, 1293 (1st Cir. 1997). Nevertheless, it is settled that an Apprendi error can be harmless where the evidence overwhelmingly establishes the minimum drug quantity needed to justify a higher statutory maximum. United States v. Duarte, 246 F.3d 56, 62 (1st Cir. 2001); Sustache-Rivera v. United States, 221 F.3d 8, 17-18 (1st

-30-

Cir. 2000).  Although the parties disagree as to whether an Apprendi claim was properly preserved at trial, our conclusion would be the same under any standard of review.

At trial, the government produced overwhelming evidence that the conspiracy involved at least five kilograms of cocaine. For example, Hector Dominicci testified to transporting and storing huge quantities of cocaine for Ayala and Perez.  On one occasion alone he handled 20 sacks of cocaine, each containing several kilograms of the drug.  Further, Victor Rodriguez, another of Jockey's contacts, testified that Ayala received drugs from air drops, each of which involved between 600 and 1,000 kilograms of cocaine.  The record is replete with other examples as well, involving Ayala, Perez, or their co-conspirators.[6]    Sepulveda, 15 F.3d at 1197; U.S.S.G. § 1B1.3(a)(1)(B).

Relying upon this evidence, the sentencing court ultimately determined that the conspiracy involved more than 150 kilograms of cocaine, or thirty times more than needed to impose a life sentence under 21 U.S.C. § 841(b)(1)(A).  Neither appellant seriously denies that the conspiracy involved at least five kilograms of cocaine.  In fact, Ayala makes no effort

_____

[6]For example, Danny Gongolon testified that he sold Ayala 37 kilograms of cocaine between 1994 and 1995 and received more than 10 kilograms from her on credit between 1995 and 1997.

whatsoever to undermine the accuracy of the sentencing court's findings. And Perez takes aim at the wrong target for Apprendi purposes--the 150 kilograms figure--conceding in his brief and at sentencing that he was responsible for more than 50 kilograms of cocaine.

Insofar as Perez attacks the district court's finding of drug amount as affecting the guidelines range, Apprendi is simply beside the point. United States v. Caba, 241 F.3d 98, 101 (1st Cir. 2001). And we find no clear error in the larger figure calculated by the court. United States v. Rivera-Maldonado, 194 F.3d 224, 228 n.2 (1st Cir. 1999).

Next, Ayala and Perez challenge the sentencing court's application of U.S.S.G. § 2A1.1, the first degree murder provision cross-referenced by section 2D1.1(d)(1), on several legal grounds. Their argument is that the sentencing court again violated Apprendi by finding, under a preponderance of the evidence standard, that they played a role in various conspiracy murders, thus subjecting them to life imprisonment. The argument fails, however, because Apprendi does not apply to findings made for purposes of the sentencing guidelines, such as the court's determinations that the appellants were accountable for the murders. Caba, 241 F.3d at 101.

Two other arguments on this score require only the briefest discussion. Ayala and Perez say that the murders are irrelevant to drug crime sentencing because neither U.S.S.G. § 2A1.1 nor the cross-reference table in Appendix A of the Guideline Manual mentions the drug statutes. To the contrary, the murders can be taken into account when sentencing for the drug crimes; U.S.S.G. § 2D1.1 explicitly cross-references the murder provision of section 2A1.1. See United States v. Padro Burgos, 239 F.3d 72, 76-77 (1st Cir. 2001).

Ayala and Perez also suggest that because the cross-reference refers to 18 U.S.C. § 1111 (1994), which embraces both first and second degree murder, a court might apply the higher base offense level for a first degree murder case where only second degree murder had been established. Compare U.S.S.G. § 2A1.1 (level 43) with id. § 2A1.2 (level 33). In the present case this is a fanciful concern since the murders committed by the conspiracy were plainly "willful, deliberate, malicious [or] premeditated" and so within the definition of first degree murder under 18 U.S.C. § 1111.

Separately, Ayala renews her objection to the district court's determination that she had two prior drug felony convictions and was thus subject to a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A). At sentencing, and now on

-33-

appeal, Ayala acknowledges having two prior felony drug convictions but says the court should have lumped the convictions together because they represent a single episode of ongoing criminal conduct.

Prior felony drug convictions will be counted separately for purposes of 21 U.S.C. § 841(b) only when they represent distinct criminal episodes. See United States v. Gillies, 851 F.2d 492, 497 (1st Cir. 1988). Ayala's prior convictions stem from several transactions, occurring over several months and involving different drugs.[7] There was no error in treating these convictions as distinct. As the Ninth Circuit has reasoned:

> An ongoing course of criminal conduct such as narcotics trafficking may involve many such criminal episodes, each a discrete occurrence. The fact that all are related, part of a series, or part of a continuous course of criminal dealing, does not necessarily render them a 'single' criminal episode, particularly where the episodes occur over time. To so hold would insulate the very career criminals the statute is designed to reach--those continuously engaged in criminal conduct.

---

[7]The Commonwealth levied four charges against Ayala for distributing cocaine on at least four different dates between October 1990 and March 1991. These charges were later consolidated. The federal government, after conducting its own investigation, charged Ayala with distributing heroin as well, apparently in or around July 1991, the date of her arrest for that crime. She pled guilty to the charges and received a five-year sentence on the Commonwealth charge(s), and a six-month sentence on the federal charge, to be served concurrently.

-34-

United States v. Maxey, 989 F.2d 303, 307 (9th Cir. 1993); see also United States v. Griffin, 109 F.3d 706, 708 (11th Cir. 1997).

Separately, Perez renews an objection he made at sentencing, claiming the court had no basis for imposing a four-level enhancement for his role in the drug offense. He acknowledges that he ran some operating units within the conspiracy (e.g., his drug points) and that a two-level enhancement is probably warranted. But he denies leading or managing the overarching conspiracy, arguing that a four-level enhancement is only appropriate for those individuals at the very top of its organization (e.g., those who coordinated among the multiple smaller operating units). Cf. United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995).

We review role-in-the-offense determinations, steeped in the facts of the case, for clear error. United States v. Cadavid, 192 F.3d 230, 237 (1st Cir. 1999). Here, the four-level increase is justified "if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(a).

The record shows that Perez ran at least two separate drug points and supervised the work of at least five other

people, including three sellers at the Los Lirios del Sur drug point; the runner, Daniel Sanchez-Ortiz; and another individual at the Santiago Iglesias point.  See United States v. Li, 206 F.3d 78, 91-92 (1st Cir. 2000).  He also worked with Ayala in retrieving drug shipments and distributing them among the organization's other drug points.

This is perhaps a close case because Ayala was more clearly a leader, although a conspiracy may have several individuals deserving a four-level enhancement, U.S.S.G. § 3B1.1, App. Note 4, and the district court gets the benefit of review only for clear error.  However, it does not much matter whether Perez is on one side of the line or the other because even a smaller three-level enhancement for being a manager or supervisor of criminal activity involving five or more participants, when combined with the two-level firearms enhancement (which Perez does not challenge on appeal), lifts Perez's base offense level to 43 and subjects him to a life term.

Lastly, Ayala and Perez say the court erred in sentencing them to 20 years for the money laundering conviction. They say the proper guideline range for the money laundering offense was 121 to 151 months, well below the 240-month

sentences they received.  However, they misread the guidelines and the sentencing record.

It is quite true that if the money laundering count were the only count of conviction, it would carry an adjusted offense level of 30, after factoring in various enhancements. This, presumably, is the figure Ayala and Perez use to calculate their sentencing ranges.[8]  The difficulty with the argument is that it ignores the manner in which the guidelines establish a single combined offense level for multiple-count convictions and use that offense level for sentencing on each count of conviction, subject to statutory maximums.

As already explained, the adjusted offense level for the drug conspiracy count for both appellants was 43 (the maximum allowed).  U.S.S.G. § 3D1.4 provides a formula for combining the offense level 43 and offense level 30 that results in a combined offense level for all counts of conviction of 43. The district court applied this formula because it held that the drug and money laundering convictions should not be grouped together under U.S.S.G. § 3D1.2--a judgment that Ayala and Perez do not challenge and we need not independently address. <u>Compare</u>

---

[8]With a criminal history category of IV, Ayala would be subject to a term of 135 to 168 months.  Thus, it is unclear why she claims that the appropriate range was 121 to 151 months; this latter range applies to defendants, like Perez, with a criminal history category III.

United States v. Harper, 972 F.2d 321, 322 (11th Cir. 1992), and United States v. Gallo, 927 F.2d 815, 824 (5th Cir. 1991), with Lopez v. United States, 104 F.3d 1149, 1150-51 (9th Cir. 1996).

Once this single combined offense level is determined, the guidelines direct that it be used for each count of conviction. U.S.S.G. § 5G1.2(b). The only pertinent qualification is that the sentence not exceed the statutory maximum for the relevant count. Id. § 5G1.1(a). It was for that reason that despite the combined offense level of 43, the court limited the money laundering sentence to the statutory maximum of 20 years. See 18 U.S.C. § 1956(a)(1). Since the 20-year sentence runs concurrently and is shorter than the life sentence, Ayala and Perez are not demonstrably worse off; but in any event the money laundering sentence is consistent with the explicit directions of the guidelines.

Martinez's sentencing claims. Martinez was the first of the appellants to be sentenced, in late May 1999, and his proceeding differed slightly from that of Ayala and Perez. The court first found that Martinez had participated in the murders of Bejumen and his wife. Applying the cross-reference to the murder provision of the guidelines, U.S.S.G. § 2A1.1, the court calculated Martinez's base offense level at 43. It then granted him a two-level downward departure for being a minor participant in the conspiracy, reducing his offense level to 41. With a

-38-

criminal history category of I, Martinez was subject to a guideline sentencing range of 324 to 405 months, and the court imposed the maximum sentence within that range.

Notably, the sentencing court made no findings concerning drug quantity at the hearing; instead, it merely recited that the jury had found Martinez guilty of conspiracy to distribute "multi kilo quantities of drugs." This was arguably error under the guidelines, because absent any drug quantity determination, the maximum statutory sentence applicable to Martinez's crime was 20 years and he was given nearly 34 years. See U.S.S.G. § 5G1.1. Martinez, however, did not object to the error at sentencing. And in his second supplemental brief in this court, he concedes several times that he was responsible for more than 500 grams of cocaine, thus exposing him to a sentencing range of five to 40 years.[9]

Martinez did make two objections at sentencing: first, that he was being sentenced for a crime (murder) for which he was neither charged nor convicted. On appeal, he renews this claim under the guise of Apprendi, suggesting, as do Ayala and

_____

[9]The district court would have had no difficulty finding Martinez responsible for over 500 grams of cocaine. Martinez was familiar with the Garcia drug point, which involved large quantities of cocaine, and the drug point transactions were foreseeable acts in the conspiracy Martinez joined through the murder of Bejumen and his wife. See Sepulveda, 15 F.3d at 1197.

Perez, that application of the cross-reference violates his due process rights. But Martinez's concession as to drug quantity is fatal to this claim of error. The sentence he received was below the statutory maximum of 40 years; as explained above, Apprendi is not implicated.

Second, Martinez made a truncated argument at sentencing concerning the sufficiency of the evidence of his participation in the murders. On appeal, he says the evidence of the murder was inconsistent. Even assuming this argument was fully preserved--which is doubtful--our review is only for clear error because Apprendi is not implicated (the murder determination affected only the guidelines determination, not the statutory maximum). The district court heard admissible hearsay evidence at trial directly implicating Martinez in the murder; the hearsay was broadly consistent with an eyewitness account of the murders; we can hardly say it was clear error for the court to credit that evidence. United States v. Cunningham, 201 F.3d 20, 28-29 (1st Cir. 2000).

Finally, in a post-argument motion for supplemental briefing on the Apprendi issue, Martinez brings to the court's attention the December 2001 sentencing of the three co-defendants who were not part of this appeal. Martinez complains that these co-defendants received a more lenient sentence

because the sentencing court felt constrained by the intervening _Apprendi_ decision. Without intimating any judgment as to these latter sentencing decisions, whose circumstances are far from clear, we decline Martinez's request for supplemental briefing on the issue. Suffice it to say that two similar defendants can easily receive different results depending on whether their sentences come before or after a watershed opinion like _Apprendi_. <u>Compare</u> <u>United States</u> v. <u>Rivera-Maldonado</u>, 124 F. Supp. 2d 788, 790 (D.P.R. 2000) (declining in post-_Apprendi_ sentencing to make drug quantity determination and sentencing defendant to lowest statutory maximum), <u>with</u> <u>Duarte</u>, 246 F.3d at 62 (upholding pre-_Apprendi_ sentence despite _Apprendi_ error on basis that defendant acknowledged responsibility for relevant drug quantity); <u>cf.</u> <u>Teague</u> v. <u>Lane</u>, 489 U.S. 288, 306-07 (1989).

## VII. POST-TRIAL EVIDENCE

Finally, Martinez and Perez separately assert a right to a new trial in light of new evidence, either on the ground that the evidence was withheld by the prosecution in violation of <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963), or, in the alternative, that it was newly discovered evidence warranting a retrial under Fed. R. Crim. P. 33. Both appellants rely on

statements by government informants that arguably impeach that of government witnesses at trial.

Since the government does not dispute that the evidence was in the possession of the prosecution and not disclosed to the defense, we apply the more generous Brady standard. United States v. Josleyn, 206 F.3d 144, 151-52 (1st Cir. 2000). Under Brady, violation of the prosecution's duty to disclose warrants retrial if the defendant can show a "reasonable probability" of prejudice, that is, that the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995); see also Strickler v. Greene, 527 U.S. 263, 289 (1999). Here we discern no possibility of prejudice in either case.

Martinez's Brady argument is based on a sworn statement in which Jaime Rivera-Morales, a former Puerto Rico police officer, admits to being one of the "police officers" who helped kidnap the Vazquezes but states that the murder was arranged by Jose Galiany on behalf of Santos Martinez, a drug dealer with no apparent connection to the Garcias. The statement was discovered after the verdict in this case, during a preliminary hearing in the Commonwealth trial of Manuel Garcia and Ventura for the Vazquez murders. Martinez says this statement could

have been used to impeach the credibility of Gongolon, and more importantly, Goglas, who was the main witness implicating Martinez in Bejumen's murder.

Wrongly withheld impeachment evidence, if powerful enough, can be prejudicial and grounds for a new trial. United States v. Bagley, 473 U.S. 667, 676-77 (1985); United States v. Patrick, 248 F.3d 11, 25 (1st Cir. 2001). This is particularly true where the evidence is highly impeaching or when the witness' testimony is uncorroborated and essential to the conviction. See Giglio v. United States, 405 U.S. 150, 154-55 (1972).

But here the statement by Rivera does little to undermine the confidence of the verdict against Martinez. Although it is true that Goglas's testimony as to the Teta-Garcia pact and the Bejumen murder provided the main link between Martinez and the drug conspiracy, see Part I above, Rivera's statement does not directly undermine Goglas's testimony on that crucial point, since it relates to the Vazquez murders. Such weak impeachment evidence on an issue tangential to the conviction is not sufficient to warrant the drastic remedy of a new trial. See Sepulveda, 15 F.3d at 1220 n.5; United States v. Nash, 29 F.3d 1195, 1202 (7th Cir. 1994).

The withheld material Perez complains of is more directly related to the evidence against him. Perez points to a report prepared by DEA Agent Clifford memorializing several interviews with Samuel Arce-Leon, a cooperating government informant. According to one of the reports, Arce stated that he overheard a conversation between other drug dealers who said that Ayala ordered Ricardo Carrasquillo and another individual to murder Sol Garcia because she wanted to take over the Los Lirios del Sur drug point. According to Arce, Ayala and Perez then took over the drug point. Perez claims that Arce's testimony is corroborated by eyewitness testimony regarding the physical appearance of the killers.[10]

Even taking the evidence most favorably to Perez, it does not undermine our confidence in his drug conspiracy conviction. Perez's participation in Sol Garcia's murder was hardly important to the jury's drug conspiracy verdict given the overwhelming evidence--including testimony of other witnesses and physical evidence such as drug ledgers--that Perez helped Ayala retrieve drugs from Jockey and ran the Los Lirios del Sur and Santo Iglesias drug points. Cf. Strickler, 527 U.S. at 294.

---

[10]This eyewitness testified that two men--one light-skinned and one dark-skinned--killed Sol Garcia; Sanchez-Ortiz testified that both men were dark-skinned. Since Carrasquillo is white, the testimony lends some support to Arce's version of the events.

The Sol Garcia murder had more relevance in the sentencing phase, where the district court cited Perez's involvement to trigger a life sentence under U.S.S.G. § 2A1.1, the murder provision cross-referenced in U.S.S.G. § 2D1.1(d). But Arce's statement was disclosed before sentencing, and the district court, after a full hearing in which both Agent Clifford and Arce testified, nevertheless determined by a preponderance of the evidence that Perez was implicated in Garcia's murder.

Apart from his <u>Apprendi</u> claim, Perez did not dispute on appeal the sufficiency of the evidence implicating him in Sol Garcia's murder. Even reading Perez's <u>Brady</u> claim generously as including an attack on the evidentiary basis for the sentence, we cannot say that the district court's sentencing decision was clearly erroneous, especially given the ambiguities in Arce's statement. <u>See</u> <u>United States</u> v. <u>Meyer</u>, 234 F.3d 319, 326 (7th Cir. 2000). In any event, because of the district court's other determinations based on drug quantity and enhancements, any error would have been harmless. <u>See</u> Part VI, above.

The judgments of conviction, the sentences, and denials of post-trial motions are <u>affirmed</u>.

**Concurrence follows.**

-45-

**TORRUELLA, Circuit Judge (Concurring).** I have not been coy in expressing my views concerning prosecutorial misconduct. See generally United States v. Moreno, 991 F.2d 943, 949-53 (1st Cir. 1993) (Torruella, J., dissenting). Thus, while I agree that in the final analysis the improper statements made by the prosecutors in closing argument do not warrant a new trial, I write separately to emphasize my impatience with the office of the United States Attorney for the District of Puerto Rico. Despite numerous warnings from panels of this Court, its prosecutors continue to flout clear rules of ethical conduct in their zeal to secure convictions.

The problem of prosecutorial misconduct in closing arguments is by no means confined to the District of Puerto Rico. Cf. Bennett L. Gershman, Prosecutorial Misconduct § 11:1, at 11-3 (2d ed. 2001) (noting that such misconduct has "become staple in American prosecutions" and "shows no sign of abating or being checked by institutional or other sanctions"). Nevertheless, federal prosecutors in Puerto Rico are conspicuous in this circuit -- and, indeed, throughout this country -- for their recalcitrance.[11] See Paul J. Speigelman, Prosecutorial

---

[11]A review of our cases from the past fifteen years demonstrates the startling frequency with which we have found closing remarks by prosecutors in the District of Puerto Rico to be improper. See United States v. Rodríguez, 215 F.3d 110 (1st Cir. 2000), cert. denied, --- U.S. ---, 121 S. Ct. 1658 (2001);

Misconduct in Closing Argument: The Role of Intent in Appellate Review, 1 J. App. Prac. & Process 115, 171-83 (1999) (analyzing the office of the United States Attorney for the District of Puerto Rico as a case study in "prosecutorial recidivism").  On several occasions we have admonished them for their continuing disregard of our precedent, but to no avail.  See United States v. González-González, 136 F.3d 6, 10 (1st Cir. 1998) ("We do note a long history of improper statements in closing argument

---

United States v. Torres-Galindo, 206 F.3d 136 (1st Cir. 2000); United States v. González-González, 136 F.3d 6 (1st Cir. 1998); United States v. Rodríguez-Carmona, No. 95-2277, 1997 WL 157738 (1st Cir. Mar. 26, 1997) (unpublished opinion);  United States v. Fernández, Nos. 95-1864, 95-2067, 1996 WL 469009 (1st Cir. Aug. 20, 1996) (unpublished opinion);  United States v. Laboy-Delgado, 84 F.3d 22 (1st Cir. 1996);  United States v. Cartagena-Carrasquillo, 70 F.3d 706 (1st Cir. 1995);  United States v. Levy-Cordero, 67 F.3d 1002 (1st Cir. 1995);  United States v. Tuesta-Toro, 29 F.3d 771 (1st Cir. 1994);  United States v. Udechukwu, 11 F.3d 1101 (1st Cir. 1993); Arrieta-Agressot v. United States, 3 F.3d 525 (1st Cir. 1993); United States v. Ortiz-Arrigoitía, 996 F.2d 436 (1st Cir. 1993); United States v. Morales-Cartagena, 987 F.2d 849 (1st Cir. 1993); United States v. Panet-Collazo, 960 F.2d 256 (1st Cir. 1992); United States v. Soto-Alvarez, 958 F.2d 473 (1st Cir. 1992); United States v. Nickens, 955 F.2d 112 (1st Cir. 1992); United States v. Hodge-Balwing, 952 F.2d 607 (1st Cir. 1991); United States v. Quesada-Bonilla, 952 F.2d 597 (1st Cir. 1991); United States v. Rodríguez-Cardona, 924 F.2d 1148 (1st Cir. 1991); United States v. de León Davis, 914 F.2d 340 (1st Cir. 1990); United States v. Machor, 879 F.2d 945 (1st Cir. 1989); United States v. Rodríguez-Estrada, 877 F.2d 153 (1st Cir. 1989); United States v. Doe, 860 F.2d 488 (1st Cir. 1988); United States v. Acevedo-Ramos, 842 F.2d 5 (1st Cir. 1988); United States v. Santana-Camacho, 833 F.2d 371 (1st Cir. 1987); United States v. Mejía-Lozano, 829 F.2d 268 (1st Cir. 1987); United States v. Giry, 818 F.2d 120 (1st Cir. 1987).

from federal prosecutors in Puerto Rico.") (citations omitted);

United States v. Levy-Cordero, 67 F.3d 1002, 1008 (1st Cir. 1995) ("[W]e repeat our concern that, after numerous warnings from this court, the prosecuting attorneys in the District of Puerto Rico persist in spiking their arguments with comments that put their cases at risk.") (citation and quotation marks omitted); United States v. Ortiz-Arrigoitía, 996 F.2d 436, 441 (1st Cir. 1993) ("[A]fter numerous warnings from this court, the prosecuting attorneys in the District of Puerto Rico persist in spiking their arguments with comments that put their cases at risk."). Given the seeming lack of response to our warnings, I must all but conclude that "[g]overnment counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking." United States v. Antonelli Fireworks Co., 155 F.2d 631, 661 (2d Cir. 1946) (Frank, J., dissenting). A tonic more potent than our written rebukes appears necessary.

Thus, I believe it is critical to emphasize a point that our prior condemnations have perhaps overlooked. Statements such as the ones found in this case are not merely passages in a trial transcript that constitute fodder for arguments on appeal. They are instances of unethical behavior that virtually all sources of authority condemn with a single

voice.  See ABA Standards for Criminal Justice § 3-5.8 (3d ed. 1993); Model Rules of Professional Conduct, Rule 3.4(e); Code of Professional Responsibility, DR 7-106(C); Restatement (Third) The Law Governing Lawyers, § 107 (2000).  It is well established that district courts have, as a component of their inherent powers, the authority to sanction such unethical behavior. United States v. Kourí-Pérez, 187 F.3d 1, 7 (1st Cir. 1999).  I would therefore urge our district courts to take a conscientious role in addressing prosecutorial misconduct in the same manner that they would address other forms of ethical misconduct: by acting swiftly and decisively to sanction and deter it.  See United States v. Doe, 860 F.2d 488, 492 (1st Cir. 1988) ("Rather than reversal on appeal, the proper remedy would have been a reprimand or the imposition of sanctions by the district court.").

Prosecutorial misconduct erodes our confidence in the very government entities charged with protecting the public's interests through enforcement of our laws.  Moreover, by presenting this Court time and again with convictions tarnished by misconduct, prosecutors breed further cynicism by asking us to affirm these convictions on harmless-error grounds.  The overall effect is one that impugns the dignity of both the

executive and the judiciary.  Its pernicious results are a cause of concern for all of us.

Given the numerous rebukes from this Court, and the apparent disregard they have been shown, federal prosecutors in Puerto Rico should now be on notice that I, for one, will review with heightened scrutiny their claims of harmless error arising from prosecutorial misconduct.